

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-3-2004

# In Re: Price

Precedential or Non-Precedential: Precedential

Docket No. 03-2084

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Price " (2004). *2004 Decisions.* Paper 567.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/567

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2084

IN RE:
MICHAEL B. PRICE;
CHRISTINE R. PRICE,
                    Debtors

MICHAEL B. PRICE;
CHRISTINE R. PRICE,
                    Appellants
            v.
DELAWARE STATE POLICE
FEDERAL CREDIT UNION

US TRUSTEE,
            Trustee

Appeal from the United States
District Court for the
District of Delaware
(D.C. Civil No. 02-cv-01339)
District Court Judge:
Joseph J. Farnan, Jr., Chief Judge

Argued January 12, 2004
Before:   SLOVITER, RENDELL, and
ALDISERT, Circuit Judges.

(Filed  June 3, 2004)

Andrea G. Green   [**ARGUED**]
Doroshow, Pasquale, Krawitz,
    Siegel & Bhaya
911 South Dupont Highway
P. O. Box 1428
Dover, DE   19903
*Counsel for Appellants*

W. J. Winterstein, Jr.   [**ARGUED**]
P. O. Box 917
Bryn Mawr, PA  19010
*Counsel for Appellee*

Eric L. Frank
Miller, Frank & Miller
21 South 12th Street
640 PSFS Building
Philadelphia, PA  19107
*Counsel for Amicus-Appellants
National Association of
Consumer Bankruptcy Attorneys*
        and
*Consumer Bankruptcy Assistance
Project*

OPINION OF THE COURT

RENDELL, Circuit Judge.

    The Prices are chapter 7 debtors who wanted to use their automobiles while remaining current on their monthly auto loan payments.  The lienholder, Delaware State Police Federal Credit Union ("Credit Union"), convinced the Bankruptcy Court and the District Court that section 521(2)(A) of the Bankruptcy Code does not permit the Prices to continue possessing the cars simply by paying their

bills, but instead allows the Prices only four options: surrender the cars, purchase them in a lump-sum payment, negotiate another loan that would attach post-petition liability, or claim a recognized exemption under the Bankruptcy Code. This issue has been the subject of no fewer than eight discordant decisions of the courts of appeals. Four courts of appeals have held that a debtor is not limited by the options enumerated in 521(2), while four others have held to the contrary. It seems that the only thing our courts can agree on is that we disagree. After a close examination of the text and context of section 521(2)(A), we conclude that the provision does not prevent nondefaulting debtors, such as the Prices, from retaining secured property by keeping current on their loans.

I.

Michael and Christine Price filed a petition for relief under chapter 7 on December 11, 2001. On their bankruptcy schedules, the Prices listed two loans owed to the Credit Union, which were secured by liens on their two motor vehicles. Along with their petition, the Prices filed a "Statement of Intention with Respect to Secured Debt," indicating that they intended to continue regular payments to the Credit Union on the two secured loans and retain the two vehicles.

Thereafter, the Credit Union advised the Prices that their only choice in connection with the retention of the cars was to exercise one of the options stated in section 521(2), namely: (1) surrender the vehicles; or, (2) if they wished to retain the vehicles, redeem the collateral by making a lump sum payment; or (3) enter into a formal reaffirmation agreement. The Prices relied on their Statement of Intention and took no further action other than keeping up the payments on the loans. At the time of filing of their petition, the Prices were current on their payments on the vehicle loans and they continued to keep the loans current during the chapter 7 proceeding. On February 21, 2002, the Credit Union filed a Motion to Compel Debtors to Elect to Surrender, Redeem, or Reaffirm Secured Debt.

On June 25, 2002, the United States Bankruptcy Court for the District of Delaware granted the Credit Union's motion, and on April 1, 2003, the United States District Court for the District of Delaware affirmed the order of the Bankruptcy Court. Therefore, the Prices are currently under order to surrender, reaffirm, or redeem their automobiles, although the effect of that order was stayed by the District Court pending this appeal.

II.

At the outset, we will examine the justiciability of this controversy in light of recent communications received from the parties regarding the effect of loan payments made by the Prices. We are persuaded that this matter is not moot.

On March 31, 2004, counsel for the

Prices notified the panel that she believed the Prices had paid the amount due to the Credit Union under both auto loans and that the matter may be moot. However, counsel urged us to decide the issue before us, as it fell under the exception to the mootness doctrine for issues "capable of repetition yet evading review." In re Surrick, 338 F.3d 224, 230 (3d Cir. 2003). The panel sought the Credit Union's response, and it too "beg[ged] for resolution by this Court" because "the factual predicate central to this appeal frequently recur[s] in the bankruptcy courts in this circuit . . . ." We note that although both parties urge us to decide the issue before us, parties may not stipulate as to whether a matter is moot. Kremens v. Bartley, 431 U.S. 119, 134 n.15 (1977). This Court is duty-bound to independently examine the issue of mootness. North Carolina v. Rice, 404 U.S. 244, 246 (1971).

Both parties make the argument that this case qualifies under the exception to the mootness doctrine for those cases that are capable of repetition and yet which evade review. "Under the 'capable of repetition' exception, a court may exercise its jurisdiction and consider the merits of a case that would otherwise be deemed moot when '(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" Merle v. United States, 351 F.3d 92, 95 (3d Cir. 2003) (quoting Spencer v. Kemna, 523 U.S. 1, 17

(1998)). It is reasonable to suppose that the Credit Union will again encounter the same scenario with respect to section 521(2) with other borrowers of auto loans. And owing to the typically short duration of these loans, the issue raised in this appeal would arguably evade judicial review.[1] That this matter has been

---

[1] The dissent appears to question whether the Credit Union is not the same "complaining party" that may confront a similar legal quandary in the future. However, it was the Credit Union that moved the bankruptcy court to compel the Prices to either redeem, reaffirm, or surrender their automobiles. The Credit Union successfully defended that ruling in the District Court and has continued to make that case to our Court. Thus, the Credit Union is undoubtedly the complaining party in the action before us. Further, the dissent contends that it is somehow "too speculative" to believe that the Credit Union will again face a borrower seeking chapter 7 protection. But the inquiry, as the dissent acknowledges, is whether there is a "reasonable expectation" that the same controversy will recur; we need not be absolutely certain of the future. As the Supreme Court has noted, "in numerous cases . . . we have found controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable." Honig v. Doe, 484 U.S. 305, 319 n.6 (1988); see also Reich v. Local 30, Int'l Bhd. of Teamsters, 6 F.3d 978, 985 n.8 (3d Cir. 1993). We

considered by several of our sister courts of appeals does not gainsay this point. Indeed, given the high volume of personal bankruptcies in this judicial circuit, and the twenty years of bankruptcy practice since the enactment of section 521(2), it is notable that this most basic issue of a debtor's obligation under chapter 7 is a matter of first impression in this Court. But in any event, even if this exception to the mootness doctrine is inapplicable, we cannot conclude on the record before us that this matter is moot.

We doubt that the letters from counsel, containing vague assertions as to the satisfaction of the Prices' loans, meet the heavy burden of establishing mootness. Princeton Cmty. Phone Book, Inc. v. Bate, 582 F.2d 706, 710 (3d Cir. 1978) ("party arguing that a case is moot must bear a heavy burden of demonstrating the facts underlying that contention" (quoting United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953))). The Court of Appeals for the Second Circuit recently resolved a strikingly similar issue of mootness with respect to the same bankruptcy provision under consideration in this appeal, section 521(2). BankBoston, N.A. v. Sokolowski (In re Sokolowski), 205 F.3d 532, 534 (2d Cir. 2000). In Sokolowski, the debtor represented to the court that the relevant loans were paid in full. The creditor bank acknowledged that the obligations were

easily conclude that the Credit Union can reasonably expect to encounter other borrowers that will file for personal bankruptcy.

paid in full but nevertheless argued that the matter was capable of repetition yet evading review. Reply Br. at 6, Sokolowski, 205 F.3d 532 (2d Cir. 2000) (Nos. 99-5048, 99-5054).[2] Notwithstanding this representation, the court held that "Sokolowski ha[d] failed to proffer competent evidence to support her claim that this particular appeal ha[d] been rendered moot. Specifically, she ha[d] not pointed to any evidence in the record of her satisfaction of the BankBoston loan or of her disposal of the vehicle in question." Sokolowski, 205 F.3d at 534. Here, there is a similar absence of any evidence demonstrating mootness. Counsel for the Prices, like Sokolowski, stated her belief that the Prices' loans were paid in full, offering no evidence whatsoever to support that assertion. Moreover, while the creditor in Sokolowski acknowledged full payment, in this case the Credit Union's response made no mention at all of whether the obligations had been paid, whether it relinquished its right to enforcement, or whether it retained its right to damages arising out of the order on appeal requiring that the debtors must redeem or reaffirm. We have no assertion by the Credit Union that the liens are fully satisfied, no evidence that would compel a finding of mootness, and no

[2]While, as the dissent notes, this fact was not specifically mentioned in the Sokolowski opinion, it is clear that the record contains the creditor's acknowledgement that the loan had been paid in full.

4

acknowledgment that it has no claim against the Prices. Because the present controversy is justiciable, we conclude that it is proper to address the merits of the Prices' appeal.

Accordingly, we have jurisdiction over the District Court's order under 28 U.S.C. § 158(d) and exercise plenary review over the District Court's interpretation of the Bankruptcy Code. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (3d Cir. 2001).

## III.

The Bankruptcy Code requires debtors to file a "statement of intention" with the bankruptcy court indicating whether the debtor intends to retain or surrender personal property subject to a security interest. 11 U.S.C. § 521(2). Section 521 provides, in relevant part, that:

The debtor shall–

(1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs;

(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate--

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, *if applicable*, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title.

11 U.S.C. § 521(1), (2) (emphasis added).

The meaning of section 521(2) has been contested since its insertion into the Bankruptcy Code in 1984. It is clear that debtors must inform the bankruptcy court whether they intend to retain or surrender collateral. Of these two general options,

surrender is straightforward. The options available in order to retain property, however, are complicated by the phrase "if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property." 11 U.S.C. § 521(2)(A). Without a doubt, a debtor intent on retaining collateral has at least these three specified options, and may redeem the property, reaffirm the underlying debt, or claim the property as exempt under section 522(b). Redemption permits a debtor, subject to court approval, to keep secured property by paying the creditor, ordinarily in lump-sum, either the fair market value or the "allowed secured claim." 11 U.S.C. § 722. Reaffirmation, on the other hand, is retention effected through the negotiation of a new loan agreement that would then survive any eventual discharge from bankruptcy. Finally, property can be exempted pursuant to section 522(b).[3] The thorny question which we decide today is whether these three options are exclusive, or whether section 521(2) contemplates additional choices, including the one asserted by the Prices, namely the ability to retain personal property by remaining current on the payments under a loan agreement.

### A.

As noted at the outset, opinions of the courts of appeals abound on this question, with the courts being evenly divided. Both the Bankruptcy Court and the District Court aligned themselves with the Courts of Appeals for the First, Fifth, Seventh and Eleventh Circuits, and concluded that the "plain language" of section 521 allowed only three options for retaining property, i.e., redemption, reaffirmation, and exemption. See Bank of Boston v. Burr (In re Burr), 160 F.3d 843, 847 (1st Cir. 1998); Johnson v. Sun Fin. Co. (In re Johnson), 89 F.3d 249, 252 (5th Cir. 1996); Taylor v. AGE Fed. Credit Union (In re Taylor), 3 F.3d 1512, 1516 (11th Cir. 1993); In re Edwards, 901 F.2d 1383, 1387 (7th Cir. 1990). In so doing, the Bankruptcy Court and the District Court rejected the views expressed by the Courts of Appeals for the Second, Fourth, Ninth, and Tenth Circuits that section 521(2) does not set out an exhaustive list of options for retention, and permits debtors to retain property while keeping payments current. See McClellan Fed. Credit Union v. Parker (In re Parker), 139 F.3d 668, 673 (9th Cir. 1998); Capital Communs. Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 53 (2d Cir. 1997); In re Belanger, 962 F.2d 345, 348 (4th Cir. 1992); Lowry Fed. Credit Union v. West, 882 F.2d 1543, 1546 (10th Cir.

---

[3]Property may be "exempted" under section 522 if it fits within the class and amount specified therein. 11 U.S.C. § 522. Up to $2,400 in value in motor vehicles can be exempted, as can interests in household items up to $8,000 in aggregate value, and certain liens can be avoided to enable the debtor to have the benefit of the exemption. Id. § 522(d).

6

1989).

Not only have the appellate courts been divided as to the result, but their statutory interpretations and methods of construction have differed as well. Several courts have found the meaning of section 521(2)(A)'s "if applicable" language to be perfectly clear. Yet like beauty, clarity is often in the eye of the beholder. And notwithstanding their perception of a plain meaning, these courts have arrived at polar opposite results: as plainly limiting a debtor's ability to retain collateral to the three options enumerated in the provision—exemption, redemption, or reaffirmation—versus plainly leaving open other unmentioned options, including the ability to retain collateral by maintaining current payments with a creditor. Compare, e.g., Burr, 160 F.3d at 843 with Parker, 139 F.3d at 668. Yet another court of appeals has held, in contradistinction to the courts employing a plain meaning analysis, that section 521(2) is ambiguous and requiring consideration of legislative history and policy for clarification of congressional intent. See Boodrow, 126 F.3d at 43.

Given the range of views among the courts of appeals, not to mention the opinions of the several able district and bankruptcy courts that have confronted this issue, it is beyond question that section 521(2) poses tough interpretive challenges. See, e.g., Ramirez v. GMAC (In re Ramirez), 280 B.R. 252 (C.D. Cal. 2002); Am. Nat'l Bank & Trust Co. v. DeJournette, 222 B.R. 86 (W.D. Va. 1998); Capital Communications Fed.

Credit Union v. Boodrow, 197 B.R. 409 (N.D.N.Y. 1996); Home Owners Funding Corp. v. Belanger, 128 B.R. 142 (E.D.N.C. 1990). But precisely this difficulty, and the reticulated nature of the Bankruptcy Code more generally, necessitates careful attention to our method of statutory construction. In this vein, we respectfully disagree with the interpretive approaches taken by our fellow courts of appeals, for we find that none are thoroughly consistent with the mode of analysis followed by the Supreme Court when it interprets the Bankruptcy Code. While noting the difficulty of discerning such meaning, see Dewsnup v. Timm, 502 U.S. 410, 435 (1992) ("I have the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case") (Scalia, J., dissenting), the Supreme Court has followed certain ground rules, which guide our construction of section 521(2) and lead us to the result we announce today.

### B.

We are to begin with the text of a provision and, if its meaning is clear, end there. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("Congress 'says in a statute what it means and means in a statute what it says there.'" (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)). This truism of statutory construction may settle the matter in the run of the mill case, but when the plain

meaning of a provision is not self-evident, this prescription is merely a starting point. Given the division among the courts, such is the case here. But just because a particular provision may be, by itself, susceptible to differing constructions does not mean that the provision is therefore ambiguous. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations. Specifically, in interpreting the Bankruptcy Code, the Supreme Court has been reluctant to declare its provisions ambiguous, preferring instead to take a broader, contextual view, and urging courts to "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Kelly v. Robinson, 479 U.S. 36, 43 (1986); see also Official Comm. of Unsecured Creditors of Cybergenics Corp., ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 559 (3d Cir. 2003) (en banc) (hereinafter Cybergenics) ("As the Supreme Court has often noted, '[s]tatutory construction [] is a holistic endeavor,' and this is especially true of the Bankruptcy Code." (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988))).[4]

Thus, ambiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error. Lamie v. United States Trustee, 124 S. Ct. 1023 (2004). Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous. Id. at 1031. Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive. In such situations of unclarity, "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived," United States v. Fisher, 6 U.S. (2 Cranch) 358, 386 (1805) (Marshall, C.J.), including pre-Code practice, policy, and legislative history.

Yet policy, pre-Code practice, and such other tools of construction are to be relied upon only when, ultimately, the meaning of a provision is not plain. When, however, we can arrive at a natural reading of a Code provision, informed not

---

[4]In Cybergenics, for example, this Court analyzed the meaning of a Bankruptcy Code provision with reference to several contextual features including related provisions, the role of creditors in chapter 11 bankruptcy proceedings, and the equitable powers of bankruptcy courts to achieve the goals of the Code. Cybergenics, 330 F.3d at 559–69.

only by the language of the provision itself but also by its context, the burden to persuade us to adopt a different reading is "exceptionally heavy." Hartford Underwriters, 530 U.S. at 9 (quoting Patterson v. Shumate, 504 U.S. 753, 760 (1992)). In Hartford Underwriters, the Supreme Court faced the question whether section 506(c) of the Code, which specified that a "trustee may" recover certain costs from property securing a claim, authorized parties other than the trustee to seek recovery. Petitioner argued that the mention of only "trustee" did not foreclose the possibility that other parties may also invoke section 506(c). While conceding that this expansive reading was possible, the Court found that the more "natural reading" was that the section limited the availability to recover to trustees alone. The Court noted that "[s]everal contextual features" supported its conclusion, including an examination of other related provisions in the Code. Id. at 6. Having settled on what was the most plausible reading in light of the statutory context, the Court dismissed petitioner's arguments concerning pre-Code practice and policy considerations. The Court found that the language of section 506(c) left "no room for clarification by pre-Code practice." Id. at 11. The Court further concluded that its "natural reading of the text" could not be overcome by an alternative interpretation's superior policy consequences. Id. at 13. We approach section 521(2) guided by the above principles of construction.

C.

We begin with the pertinent text of section 521(2)(A). Congress has mandated that a debtor must file a statement of intention "with respect to the retention or surrender of such property and, *if applicable*, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property." 11 U.S.C. § 521(2)(A) (emphasis added). The trouble lies with the phrase "if applicable." Do those words merely indicate that the three options—exemption, redemption, and reaffirmation—are relevant when a debtor intends to retain and not applicable when a debtor chooses to surrender the collateral? If so, section 521(2)(A) sets out an exhaustive set of retention options. Or does "if applicable" mean "if" the debtor wishes to choose any of the three options that follow on its heels, i.e., when redemption, reaffirmation, and exemption "apply," that intention must be specifically stated? If the latter construction is correct, then section 521(2)(A) leaves available other methods of retention, such as by keeping the loan current.

The Courts of Appeals for the First, Fifth, Tenth, and Eleventh Circuits have concluded that the plain meaning of section 521(2)(A) limits a debtor to specifying one of the three options enumerated in the provision if retention is "applicable." The First Circuit, for instance, has reasoned that "it is perfectly

conventional usage, and perfectly good English, for Congress to have phrased § 521(2)(A) in the way it did because it intended chapter 7 debtors to elect surrender or retention, and then, 'if' retention is 'applicable,' to specify which of the following three retention options they intend to employ." Burr, 160 F.3d at 848 (citing Boodrow, 126 F.3d at 59 (Shadur, J., dissenting)); see also Taylor, 3 F.3d at 1516 (finding that plain language of section 521 provides a debtor with only three option to retain collateral); Johnson, 89 F.3d at 252 (holding that the "clear language" of section 521(2) limits a debtor to the options enumerated in the provision); Lowry, 882 F.2d at 1545 ("The plain English of the section requires every debtor [intent on retaining collateral] . . . . to elect whether to redeem or reaffirm.").[5]

By contrast to these courts, the Courts of Appeals for the Fourth and Ninth Circuits have found that the plain language of section 521(2)(A) clearly

supports the opposite conclusion. In Parker, the Court of Appeals for the Ninth Circuit found it plain that section 521(2)(A) did not limit debtors to the three options set forth in the statute, i.e., redemption, reaffirmation, and exemption. 139 F.3d at 673. The court held that the provision only mandated the filing of a statement of intention. "Then, 'if applicable,' —that is, if the debtor plans to choose any of the three options listed later in the statute . . . the debtor must so specify in the statement of intention." Id. The court concluded that other retention options, including retaining property while keeping a loan current, were unaffected by section 521(2)(A). Having found the meaning of section 521(2)(A) to be plain on its face, the court found no reason to wade into legislative history or policy. Similarly, the Court of Appeals for the Fourth Circuit has held that if Congress had intended to limit a debtor to the three options in section 521(2), it could have said so. See Belanger, 962 F.2d at 345. Section 521(2)(A) "would have simply provided: 'and specifying that such property is claimed as exempt, that the debtor intends to redeem such, or that the debtor intends to reaffirm debts secured by such property.'" Id. at 348. Moreover, the leading bankruptcy treatise is in accord with this reading of section 521(2): "Nothing in section 521(2) requires the debtor to choose redemption, reaffirmation or surrender of the property to the exclusion of all other alternatives. Section 521(2) merely requires a statement of whether the debtor intends to choose any of those options, *if applicable*." 5 Collier

---

[5]Notwithstanding this restrictive reading of section 521(2)(A), the Tenth Circuit in Lowry held that bankruptcy courts had the discretion to permit a debtor to choose other retention options. The court's reasoning emphasized the absence of any express means to enforce section 521(2). Lowry, 882 F.2d at 1547 ("[A]lthough we regard as mandatory the provisions of [section 521(2)], we do not believe those provisions make redemption or reaffirmation the exclusive means by which a bankruptcy court can allow a debtor to retain secured property.").

on Bankruptcy ¶ 521.10[2] (15th rev. ed. 2004) (emphasis in original) (footnote omitted).

Thus, an isolated reading of the "if applicable" phrase has led to diametrically opposed results. "If applicable" may be fairly read to limit a debtor's retention options to redemption, reaffirmation, and exemption but it may also be fairly read to leave open the possibility of other options. Nothing in the language of section 521(2)(A) suggests one reading over another, which in part explains the contrasting judicial interpretations. In light of this division of opinion, we conclude that section 521(2)(A)'s command reasonably admits of two readings. But such equivocality is not enough to conclude that the provision is ambiguous. Proper statutory construction requires us to situate section 521(2)(A) in the context of the Code. "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." Timbers of Inwood, 484 U.S. at 371 (citation omitted). We therefore turn to other provisions, first subparagraphs (B) and (C) of section 521(2), then to the Code in general, to see if they help guide our reading of (A).

D.

Section 521(2)(B) requires a debtor to "perform his intention with respect to such property, as specified by subparagraph (A)" within forty-five days. This time-limit has been cited by appellees and several of our fellow courts of appeals as strong support for reading section 521(2)(A) as to only permit the three enumerated options for retention. These courts have reasoned that the regular payments to a lender cannot be "performed" within forty-five days after the filing of a notice of intent. 11 U.S.C. § 521(2)(B); Burr, 160 F.3d at 847 (citing Boodrow, 126 F.3d at 59 (Shadur, J., dissenting)). But we do not view subparagraph (B) as necessarily helpful, one way or the other, in our interpretation of (A).

Section 521(2)(B) should not be read as mandating that debtors must entirely consummate their stated intention within forty-five days. See 5 Collier on Bankruptcy ¶ 521.10[3] (15th rev. ed. 2004). Several illustrations make this clear. While surrender could be made by a debtor, a creditor may decline to accept surrendered collateral. Debtors and creditors may not agree on the terms of a reaffirmation agreement. And even if negotiation yields an agreement, a court may nevertheless decline to approve it if, for instance, it concludes that a debtor, unrepresented by counsel, negotiated an agreement that would not be in that debtor's best interests. See 11 U.S.C. § 524(c)(6)(A)(ii). Even with court approval, the Code permits debtors to rescind a reaffirmation agreement any time prior to discharge or within sixty days of

11

filing of the agreement with the court. Moreover, a creditor's challenge to a claim for exemption may require more than forty-five days. Thus, section 521(2)(B) cannot really mean that a debtor must fully accomplish the option set out in the statement of intention within this time frame. Read reasonably, section 521(2)(B) requires debtors to take steps to act on an intention to either retain or surrender. Indeed, the authoritative *Collier on Bankruptcy* describes the provision as a "guideline signaling a trustee as to when he or she should take action to move a chapter 7 case to its conclusion by ensuring that the debtor takes those steps remaining to be taken." Id. And, steps toward retention with ongoing payments can surely be taken in the required time frame. We, therefore, do not read section 521(2)(B) as necessarily excluding the reading the Prices urge. They did perform their intention to retain within 45 days by keeping their payments current in that period. We next turn to subparagraph (C) of section 521(2).

E.

Section 521(2)(C) provides that "nothing in the subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title." We view this subparagraph to be of enormous aid in our reading of section 521(2)(A). Here, Congress has directed that courts afford debtors the rights provided elsewhere in the Code, specifically telling us not to read section 521(A) or (B) as impinging on the substantive rights guaranteed by other provisions. And, our examination of the substantive rights provided elsewhere in the Code guides us to conclude that although unstated in section 521(2), debtors do have the option to retain property while staying current on loan payments. In other words, the Code anticipates and affords the retention option that the Prices have selected.

This is because, when viewed as a whole, the Bankruptcy Code allows debtors to retain collateral, and keep current on their loans, so long as that collateral is adequately protected. This choice is not a "fourth option," fashioned as a novel exception to the Code; it is the norm of chapter 7 bankruptcy law. See Burr, 160 F.3d at 847 (characterizing option to retain and keep current as an "unstated fourth option"). Upon the filing of a chapter 7 proceeding, all of the property of the debtor becomes property of the estate, and the trustee takes over that property and administers it. At the moment the petition is filed, all secured creditors are held at bay by virtue of the provisions of the automatic stay. 11 U.S.C. § 362(a). The automatic stay does not, however, confer to a debtor unfettered rights over collateral; a creditor's interest in its collateral remains preserved. A secured creditor retains the right to "adequate protection" of its collateral, which means it is entitled to have the value of its collateral maintained at all times, and it can obtain relief from the automatic stay and take back its collateral at any time if

that interest is not adequately protected or for other "cause." See 11 U.S.C. § 362(d).[6] A persistent failure to make monthly payments under loan documents can constitute cause for granting relief from the automatic stay. See, e.g., In re James River Assoc., 148 B.R. 790, 797 (E.D. Va. 1992); In re Kerns, 111 B.R. 777, 789-90 (S.D. Ind. 1990); In re Klepper, 69 B.R. 98, 100 (Bankr. M.D. Pa. 1987). If the value of collateral is threatened, creditors may seek adequate protection and relief from the automatic stay, giving the permission to foreclose on the property. However, as long as the creditor is adequately protected, i.e., the debtor is not harming the collateral and its value is being maintained (ideally, through the making of regular payments), the substantive provisions of the Bankruptcy Code, and the notice provisions of section 521(2), do not give the secured creditor a right to take any action whatsoever. See

Lowry, 882 F.2d at 1546 ("Congress provided neither a penalty for a debtor's failure to comply with § 521(2) nor a specific remedy for a creditor as a consequence of such a failure." (footnote omitted)). Thus, if permitted to keep their cars and honor their agreements with their creditors, the Prices would be availing themselves of rights guaranteed by the Code.

The rest of the Code sets out a period of time during which it is anticipated the debtor will retain property. Generally applicable provisions of the Bankruptcy Code permit the trustee to move to avoid liens on property, and permit the debtor to convert the chapter 7 proceeding to a chapter 13 proceeding. Also, the trustee is empowered to sell property of the estate pursuant to section 363, and the specific provisions of chapter 7 provide that the trustee is obligated to collect and reduce to money the property of the estate and to be accountable for all such property. 11 U.S.C. § 704(1)(2).

At the close of a chapter 7 proceeding, but before a final distribution of property of the estate, the trustee is to dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been otherwise disposed of. See id. § 725. In addition, under section 554, the trustee may abandon property that is of "inconsequential value and benefit to the estate," which would include property in which the estate has little interest by virtue of the amount of a lien held by a secured

---

[6]Section 362(d) provides in part that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1).

creditor. Id. at § 554. Routinely, property that the debtor desires to keep, the value of which is less than the lien securing it, is abandoned to the debtor. And, under section 727, the debtor is to receive a discharge from all his debts, thus giving the debtor a "fresh start." Id. § 727. Thus, we see that several options for dealing with property are provided for elsewhere in the Code and are not listed in section 521. These provisions lose their meaning if the choices available in the first forty-five days are limited by section 521(2)(A).

The existence of these other substantive rights leads us to the conclusion that section 521(2), when viewed in the context of the entire Bankruptcy Code, is not intended to deprive the Prices of broad retention options.

F.

We also believe that viewing section 521(2) as serving a procedural, rather than substantive, function in the Bankruptcy Code makes sense. The provision sets forth a debtor's obligations in all bankruptcy proceedings.[7] For

---

[7] Viewing section 521 as a notice provision also makes sense when one considers the ramifications of not giving notice. The leading bankruptcy treatise explains that, "even if the debtor fails to indicate an intent to redeem or exempt property, that failure does not preclude

instance, subsection (1) requires the filing of a list of creditors; subsection (3), cooperation with the trustee; subsection (5), appearing at a hearing; and, subsection (2), notice to the creditor in certain circumstances.

---

either action. The statement of intention may be amended, and the statute makes clear that nothing in section 521(2) may alter the debtor's rights, such as the rights to exempt or redeem property. Even if the debtor fails to indicate an intent to redeem or exempt property, that failure does not preclude either action." 5 Collier on Bankruptcy ¶ 521.10[2] (footnotes omitted). Further, Collier notes that "because the statute is intended to affect only procedure, and not substantive rights of the debtor, the debtor may still decide not to follow through on the stated intention, and choose, for example, not to redeem or reaffirm even though an intention to do so was originally stated." Id. ¶ 521.10[4] (footnote omitted). If section 521 is viewed, however, as limiting the debtor's options, does that not necessarily mean that the debtor must follow through on one of these three options (presumably, within 45 days) and perhaps suffer loss of the property in a motion for relief from the stay – based on cause – if he fails to do so? It is difficult to reconcile this thinking with the specific provision that this section is not intended to affect substantive rights. Not surprisingly, the opinions that proceed along these lines have not confronted this conundrum.

14

While several actions taken by debtors necessitate notice, others do not. The notice required in section 521(2) has pragmatic implications. An intention to redeem secured property presupposes a dialogue with the creditor, as does negotiating the reaffirmation of an underlying debt. Further, creditors and trustees have the opportunity to object to a debtor's claims that certain property is statutorily exempt from distribution to creditors. See Bankruptcy Rule 4003(b); Taylor v. Freeland & Kronz, 503 U.S. 638, 639 (1992). Consequently, a debtor's intention to redeem, reaffirm, or claim an exemption is valuable information for a secured creditor to learn at the beginning of a chapter 7 proceeding, when a lienholder is deciding whether to contest a bankruptcy, including relief from the automatic stay. In contrast to these modes of retention, electing to keep collateral by remaining current on one's loan obligation—essentially affording the protection required by the Code—does not require specific creditor action. If the debtor does not default, "the secured creditor has all the information necessary to make a decision regarding the collateral. Indeed, the secured creditor has little to do under such circumstances except wait for the expiration of the automatic stay." Scott B. Ehrlich, The Fourth Option of Section 521(2)(A)—Reaffirmation Agreements and the Chapter 7 Debtor, 53 Mercer L. Rev. 613, 656 (2002). Sensibly, section 521(2)(A)'s notice requirements do not implicate a debtor's intention to retain collateral by remaining current because the option does not require creditors to take any action other than continuing to receive the bargained for amounts due.

Accordingly, we read the statutory language of section 521 on its own and in the context of the Code, as setting forth a notice provision that does not limit a debtor's substantive retention options to the three stated therein.

G.

Because our view that section 521(2)(A) does not bar nondefaulting debtors from retaining collateral is based on the plain language of the statute, the burden to persuade us to adopt a different reading is "exceptionally heavy." Hartford Underwriters, 530 U.S. at 9. We next consider whether any extratextual indicators, such as legislative history and policy, would cause us to depart from our conclusion.

There is not a hint in the legislative history that Congress intended to prevent the Prices from retaining collateral as the Prices have done. Such a significant alteration in the substantive rights of debtors is not only doubtful in light of the plain language of the provision, but would have, we believe, occasioned some mention in the pages of the Congressional Record. See Timbers of Inwood, 484 U.S. at 380 (holding that "it is most improbable that [a significant change to bankruptcy procedure] would have been made without even any mention in the legislative history."). To the contrary, what little legislative history there is underscores the

correctness of our reading of section 521(2).[8]

Section 521(2) was inserted into the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333-392 (1984). But Congress deliberated over its basic form as early as 1981, when the Senate Judiciary Subcommittee on Courts heard testimony concerning the operation of the Bankruptcy Reform Act of 1978. At these hearings, a coalition of bankers, credit unions, finance companies, oil companies, and retailers introduced a proposal to create a notice provision that culminated in the enactment of section 521(2).[9] These various creditors explained that because chapter 7 bankruptcies took

---

[8]See Ehrlich, supra, at 630 (observing that "detailed" committee reports for earlier, similarly drafted versions of section 521(2) confirm that a debtor is not limited to retention, reaffirmation, and exemption).

[9]The following discussion relies on Bankruptcy Judge A. Thomas Small's comprehensive survey of section 521(2)'s legislative history. In re Belanger, 118 B.R. 368, 370–72 (Bankr. E.D.N.C. 1990), aff'd, 962 F.2d 345 (4th Cir. 1992); see also Boodrow, 126 F.3d at 50 (relying extensively on Judge Small's discussion of legislative history). Judge Small's analysis is particularly compelling as he was one of the witnesses who testified before the Senate Subcommittee in 1981. In re Belanger, 118 B.R. at 371 n.4.

place behind the veil of the automatic stay, secured creditors possessed virtually no information about their collateral. Creditors who initiated proceedings to lift the stay often learned that the debtors were intending to surrender the collateral without a contest all along. The coalition of creditors recommended a notice provision in the Code to remedy this communication failure.

After extensive debate, earlier versions of 521 were reported out of the Senate Judiciary Committee in both 1982 and 1983. Perhaps the attention this issue received from Congress from 1981 through 1983 explains the paucity of legislative history surrounding section 521(2)'s ultimate enactment in 1984, when the bill was passed without extensive debate or published committee reports. Indeed, the only shred of legislative history comes in the form of an exchange on the floor of the House of Representatives. The colloquy, between Representative Synar and Representative Rodino, who was then chairman of the House Judiciary Committee, is illuminating. When Representative Synar asked for an explanation of debtors' rights under section 521(2)(C), Representative Rodino replied that "this section is designed to make it clear that the newly imposed duty on the debtor to act promptly with regard to property which is security for a creditor's claim does not affect the substantive provisions of the code which may grant the trustee or debtor rights with regard to such property." 130 Cong. Rec. 6204 (1984). These comments underscore

our construction of the plain language of section 521(2), confirming that section 521(2) concerned timing and notice and was not intended to alter the substantive rights of debtors or trustees. Cf. Barnhart v. Sigmon Coal Co., 534 U.S. 438, 457 n.15 (2002) (finding that floor statements could not outweigh the clear and unambiguous language of a statute).

The legislative background of section 521(2) indicates that Congress enacted a notice provision in response to creditors' complaints that they had insufficient information of a debtor's intentions. There is no hint that the provision was to serve another purpose or to remedy other ills. At the very least, there is no indication that Congress enacted section 521(2) to aid creditors somehow menaced by debtors who dutifully met their payment obligations.

Relatedly, a few of our sister courts of appeals have argued that reading section 521(2)(A) to permit retention by staying current would unfairly harm creditors in two ways. First, these courts have reasoned that no rational debtor would elect to redeem or reaffirm if the debtor could exercise the option the Prices have chosen. See, e.g., Boodrow, 126 F.3d at 60 (Shadur, J., dissenting). This observation lacks persuasive force. First of all, it is not entirely clear that the draconian choices of redemption—ordinarily untenable for chapter 7 debtors who are, by definition, insolvent and unlikely to possess the funds to buy their secured property outright—or of the negotiation of an onerous reaffirmation agreement—are to be celebrated as preferred under the Code. In fact, the opposite is probably more to the point, as we will discuss below. But, even if we were concerned as to the disappearance of these options, the Credit Union has simply not shown that this result will follow. As the Second Circuit has recognized, a debtor with an option to retain collateral while keeping current may nevertheless have sound reasons to reaffirm. "[A] debtor may seek to reaffirm in order to reestablish credit standing after a bankruptcy discharge, or if the debtor was not current on the loan when the bankruptcy petition was filed, to obtain a new agreement that would provide for the right to cure the arrearage and avoid default." Id. at 52. In short, our decision does not nullify redemption, reaffirmation, and exemption as options. Certainly the Credit Union has not adduced any evidence of this dramatic result. Given that over twenty states currently offer debtors the retention option the Prices have selected, it would not have been difficult for the Credit Union to advert to some evidence that the sky has fallen. Tellingly, the Credit Union has not done so. While we do not doubt that retention while staying current may be "the most advantageous option" for some chapter 7 debtors, id. at 60 (Shadur, J., dissenting), our construction of the plain language of section 521(2) does not turn on the relative desirability of the various rights provided in the Code.

Second, some courts have been troubled that allowing this option of

retention somehow transforms secured loans into nonrecourse debt without any obligation to maintain collateral in good condition. See, e.g., Taylor, 3 F.3d at 1515–16 ("Allowing a debtor to retain property without reaffirming or redeeming gives the debtor not a 'fresh start' but a 'head start.'"). The purported evil of discharging personal liability of a debtor is not worthy of discussion, as a discharge is the obvious and inevitable purpose of a bankruptcy proceeding. Further, it is not clear to us, nor was it clear to the Second Circuit, that creditors would be vulnerable to financial injury from nondefaulting debtors who pay their bills. Boodrow, 126 F.3d at 52 (doubting whether creditors "will necessarily or even probably suffer financial injury when a debtor who is current on a loan retains the collateral and continues to make the payments required under the loan agreement").

The loss of personal liability does not necessarily mean that creditors are vulnerable. Indeed, a creditor's financial interest in the collateral is already safeguarded by the adequate protection provision of the Code. As we have discussed above, section 362(d)(1) would allow creditors to seek to lift the automatic stay if collateral is unprotected. See 11 U.S.C. § 362(d)(1) (permitting lifting of automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest"). We have explained that, "in determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity

cushion'—the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims." Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs.), 61 F.3d 197, 207 (3d Cir. 1995).

However, some courts have questioned whether debtors possess an incentive to maintain secured property absent the threat of personal liability. The fear is overstated and entirely hypothetical. It is just as reasonable to assume, given the difficulty insolvent consumers may have in obtaining future financing, that such debtors would have ample incentive to maintain their collateral, such as their automobiles, in good condition. Additionally, it is commonplace for creditors to insist on certain maintenance requirements in the original loan agreement. "In fact default clauses which permit the lender to declare a default in the event that the creditor deems its security interest insecure are specifically authorized by the Uniform Commercial Code and may be exercised by a secured lender if it has a good faith belief that the prospect for payment is impaired." Boodrow, 126 F.3d at 52 (quoting In re Belanger, 118 B.R. at 372). Accordingly, a creditor's financial interests are not necessarily compromised by allowing debtors to retain collateral while continuing to make their monthly payments.

In the event that debtors such as the Prices do default on their payments, we agree with the Second Circuit's conclusion that a bankruptcy court may lift the

automatic stay. Id. at 52–53 ("Thus, a debtor in default on a loan at the time of the bankruptcy petition or whose behavior indicates that he will not be able to continue making scheduled payments might well suffer a lifting of the stay."). So, in the absence of a default or an insufficient equity cushion, a creditor is not left high and dry. And when a creditor's financial interests are not impaired, the objections to our interpretation of section 521(2)(A) resolve into a general displeasure with the elimination of personal liability. But as we have noted, the discharge of personal liability is the essence of bankruptcy, the prerequisite of a "fresh start." Without a showing of grave financial injury to creditors, we are not persuaded to depart from the plain meaning of section 521(2)(A).

Lastly, but importantly, we believe that our reading comports best with the "fresh start" policy of the Code, because a limited reading of section 521(2)(A) would practically force debtors to reaffirm their obligations. Accord id. at 51 ("[c]onfining an individual Chapter 7 debtor to the choices of surrender, redemption or reaffirmation can severely interfere with providing the debtor a fresh start"). This is because redemption is in most cases illusory for cash-strapped chapter 7 debtors, requiring payment in full, and because the right to exempt property is very limited. Under the Credit Union's interpretation, reaffirmation would remain as the only real retention option. However, reaffirmation is viewed as a classic evil in bankruptcy law, and is dealt with in the Code so as not to exalt or enable it, but, rather, so as to regulate and scrutinize it, in light of its misuse. See 11 U.S.C. § 524(c). As one commentator has observed, "[s]ection 524, as enacted in 1978 (and as modified since then in 1984 and 1986), allows reaffirmations when it benefits debtors to do so, but requires extensive procedural safeguards to prevent ill advised reaffirmations." See Ehrlich, supra, at 660. We observe that debtors would either have to accept possibly onerous terms set by the creditor or surrender the property.[10] For instance, one court of appeals has held that the Code does not prohibit creditors from

---

[10]The Court of Appeals for the First Circuit reasoned that "strictly speaking, debtors are never 'forced' to enter into reaffirmation agreements; they can always surrender the property and be discharged of the underlying debt." Burr, 160 F.3d at 848. While this interpretation may be technically correct, it may be unrealistic. For example, although redemption is a retention option, the Burr court did "not doubt that redemption is beyond the means of most chapter 7 debtors, and that chapter 7 debtors wishing to retain consumer goods on which they owe money will, as a practical matter, be compelled to enter into reaffirmation agreements with their secured creditors." Id. But, also a practical matter, many debtors may find it difficult to surrender property that is vital to them, such as an automobile used to commute to one's workplace.

conditioning reaffirmation on the debtor's agreement to reaffirm additional, unsecured debts. Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 400 (1ˢᵗ Cir. 2002). Thus, instead of fulfilling both parties' bargain, as is the case if the debtor keeps up the contractual payments, reaffirmation in fact nullifies an existing bargain and permits creditors to impose terms on debtors that compromise the goals of a fresh start.

To be clear, our construction of section 521(2) is supported by, but does not depend on, this policy discussion. In essence, bankruptcy law is bilateral, replete with protections and policy considerations favoring both debtors and creditors. We leave it for Congress to balance these complex and conflicting policy interests. Our task of statutory construction does not depend on evaluating whether one side or another is unfairly affected by the plain language of the section. See Lamie, 124 S. Ct. at 1032 ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."); Hartford Underwriters, 530 U.S. at 13 ("[W]e do not sit to assess the relative merits of different approaches to various bankruptcy problems."). It is enough for our purposes that the plain language of the provision, when viewed in the context of its section and the Code as a whole, leads to the result we embrace, namely that section 521(2)(A) is a notice provision which does not restrict debtors from retaining their automobiles while staying current on their loan payments.

III.

For the foregoing reasons, the order of the District Court will be reversed.

SLOVITER, Circuit Judge, Dissenting.

I respectfully dissent. I do not reach the court's conclusion on this perplexing bankruptcy issue because I am convinced that we have no jurisdiction, as the controversy is plainly moot. That is not a matter of choice but of constitutional necessity.

It is axiomatic that "this court has a 'special obligation' to satisfy itself of its own jurisdiction." United States v. Touby, 909 F.2d 759, 763 (3d Cir. 1990) (quoting McNasby v. Crown Cork & Seal Co., 832 F.2d 47, 49 (3d Cir. 1987)). "[A] case will be considered moot, and therefore nonjusticiable as involving no case or controversy, if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." In re Surrick, 338 F.3d 224, 229 (3d Cir. 2003) (internal quotation marks and citation omitted).

Our analysis of whether a case is moot must begin with "the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." North Carolina v. Rice, 404 U.S. 244, 246 (1971) (citation omitted).

> This case-or-controversy requirement subsists through all stages of federal

20

judicial proceedings, trial and appellate. . . . The parties must continue to have a personal stake in the outcome of the lawsuit. This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.

Spencer v. Kemna, 523 U.S. 1, 7 (1998) (internal quotation marks and citations omitted) (emphasis added).

We have previously stated that in order for there to be a case or controversy, there must be "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution." In re Surrick, 338 F.3d at 229-30. The majority seeks to bring this case into the exception to the mootness doctrine recognized in Matter of Kulp Foundry, Inc., 691 F.2d 1125, 1129 (3d Cir. 1982), for issues that are capable of repetition yet evading review. I believe that exception is inapplicable.

The issue in the instant case is whether section 521(2)(A) of the Bankruptcy Code requires the debtors to surrender the automobiles for which they were making loan payments, purchase them in a lump sum payment, renegotiate their respective loan agreements, or claim a recognized exemption under the Bankruptcy Code instead of continuing their current payments and maintaining possession. Shortly after this appeal was argued, counsel for the Debtors/Appellants informed the court by letter that "[n]o outstanding balance remains on either of the two loans at this time" because one car was involved in a collision for which the insurance coverage was sufficient to pay the remaining balance on the loan, and the other car was paid for in full by the Appellants. Letter from Andrea G. Green, Counsel for Appellants, to Clerk of Court, at 1 (Mar. 25, 2004). The creditor did not respond by denying "that the other car was paid for in full." Factually, there is no live controversy--this court's decision on the issue will have no impact on either party.

In order to satisfy ourselves that we continued to have jurisdiction, we directed that the parties address whether the case is now moot. Surprisingly, the Debtors and the Creditor both took the position that the issue is capable of repetition yet evading review. The Creditor stated, "The question commonly arises when a consumer debtor with a five-year auto loan files for bankruptcy relief . . . . Because of the time required to prosecute an appeal to this Court, the issue would most probably become moot in such cases, assuming that the debtor continues to make payments to

the secured creditor, prior to resolution by this Court." Letter from W.J Winterstein, Jr., Counsel for Appellee, to Clerk of Court, at 1 (Apr. 28, 2004) (emphasis added). Significantly, the Creditor did not deny that there was nothing more owing in this case. However, it is understandable why the Creditor would want this court to decide the issue as other debtors may seek the same option the Prices sought and the Creditor resists. Why the Prices took that position is less understandable. One would have assumed that they would prefer to have the case behind them, which leads me to wonder whose interest is being served by their counsel's insistence that the case is not moot.

The exception to mootness on which the majority relies does not apply here.

As the Supreme Court has stated:

The capable-of-repetition doctrine applies only in exceptional situations where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party[11] will be

subject to the same action again.

Spencer, 523 U.S. at 17 (internal citations and quotation marks omitted). It is highly unlikely that the Prices will again face the same situation.

The Supreme Court has stated there must be an "exceptional situation" present to "permit departure from the usual rule in federal cases that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." DeFunis v. Odegaard, 416 U.S. 312, 319 (1974). The Credit Union's bald assertion that "the issue would most probably become moot in such cases," supra, is too speculative to warrant characterization as an "exceptional situation."

The Supreme Court has stated, "The burden of demonstrating mootness 'is a heavy one.'" County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citing United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953)). This court, in Princeton Community Phone Book, 582 F.2d 706, 710 (3d Cir. 1978), stated that the "party arguing that a case is moot must bear a heavy burden of demonstrating the

---

[11] It is not readily apparent which party is the "complaining party" in a bankruptcy proceeding. The Prices filed for relief under Chapter 7, and so initiated

proceedings in the federal court system. To protect its interests, the Credit Union filed the Motion to Compel that the District Court granted and the Prices are now appealing. Even if the Credit Union were deemed to be the complaining party, its vague assertion of likelihood of repetition cannot meet the "exceptional situations" standard.

facts underlying that contention." Id. The majority argues that these "letters from counsel, containing vague assertions as to the satisfaction of the Prices' loans, [do not] meet the heavy burden of establishing mootness." Majority Op. at 4 (citing Princeton). This is not surprising as both parties explicitly implore the court to resolve the issue despite the lack of a current controversy.

It may be an open issue as to which party has the burden to show mootness. The Supreme Court has stated:

> We presume that federal courts lack jurisdiction "unless 'the contrary appears affirmatively from the record.'" Bender v. Williamsport Area School Dist., 475 U.S. 534, 546 (1986), quoting King Bridge Co. v. Otoe County, 120 U.S. 225, 226 (1887). "'It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" Bender, supra, 475 U.S. at 546 n.8, quoting Warth v. Seldin, 422 U.S. 490, 517-518 (1975).

Renne v. Geary, 501 U.S. 312, 316 (1991).

In prior cases, the Court placed the burden on the party claiming mootness who sought to use that claim defensively to preclude suit. See W.T. Grant Co., 345 U.S. at 632-33; Davis, 440 U.S. at 631-32. In the Second Circuit case relied on by the majority, In re Sokolowski, 205 F.3d 532 (2d Cir. 2000), the debtor alone claimed mootness. The opinion does not indicate that the appellant creditor bank conceded there was no outstanding debt.[12] It was therefore reasonable to place the burden on the debtor claiming mootness, as the bank could have been left with no judicial recourse to resolve that issue. In the instant case, both parties concede the fact of actual mootness, and we therefore need not decide which bears the burden.

We cannot avoid the principle that parties cannot stipulate as to whether a matter is moot. Allowing the parties to bypass the mootness issue simply by filing factually vague letter briefs because they desire judicial resolution would be tantamount to stipulating out of mootness. The Supreme Court has stated,

> The dissent's startling statement that our insistence on plaintiffs with live claims is purely a matter of form

---

[12] The majority Opinion states that in In re Sokolowski, the creditor bank conceded that the debtor's obligations were paid in full, but the Sokolowski opinion contains no suggestion of this concession, nor is there any indication that the court considered or gave credence to any concession. One can reasonably assume that the court decided the mootness issue only on the factual deficiency of the debtor's proffer, as that is the only reason the opinion provides.

would read . . . Art. III out of the Constitution. The availability of thoroughly prepared attorneys to argue both sides of a . . . question . . . does not dispense with the requirement that there be a live dispute between live parties before we decide such a question.

[T]he fact that the parties desire a decision on the merits does not automatically entitle them to receive such a decision. It is not at all unusual for all parties in a case to desire an adjudication on the merits when the alternative is additional litigation; but their desires can be scarcely thought to dictate the result of our inquiry into whether the merits should be reached.

Kremens v. Bartley, 431 U.S. 119, 134 n.15 (1977) (internal quotation marks and citations to dissent omitted). It follows that however learned Judge Rendell's opinion on a subject of some interest and however much light it would spread, it is, at most, an advisory opinion. The Credit Union has not argued that there is still

money due it and it can no longer do so at this late date. The Prices have only one automobile now, and the debt for that has been fully paid. Accordingly, I would dismiss this appeal as moot.